IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

RICHARD DILDAY                                                                              PLAINTIFF

v.                      Civil No. 04-4093

H.L. PHILLIPS, Miller County
Sheriff; and JEFF BLACK, Warden,
Miller County Detention Center                                  DEFENDANTS

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Richard Dilday, a former inmate of the Miller County Detention Center, brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. Dilday contends his constitutional rights were violated while he was an inmate of the Miller County Detention Center when the defendants failed to protect him from attack by fellow inmates. Dilday also contends defendants retaliated against him for filing grievances and/or this civil suit.

An evidentiary hearing was conducted on September 1, 2005. Following the presentation of evidence, the issues were taken under advisement pending preparation of this report and recommendation.

## **I. BACKGROUND & EVIDENCE PRESENTED**

Dilday was incarcerated at the Miller County Detention Center (MCDC) from March 20, 2004, until June 18, 2004. He was incarcerated because of pending criminal charges.

At the evidentiary hearing, the court heard the testimony of the following witnesses: (1) Richard Dilday; (2) Sheriff H.L. Phillips; (3) Jeff Black; (4) Michael Wade; (5) Bradley Betus; (6) Willis Walker; (7) Charles Prichard; and (8) Courtney Sims. For purposes of discussion, we will summarize in the first person the testimony given.

*Testimony of Richard Dilday*

On March 21, 2004, I was attacked. The attack occurred just before lunch. I came into the detention center the night before. I was put in a cell with another inmate. I believe his name was Billy Williams. This was the first time I had ever been in the detention center.

I brought some cigarettes into the facility. You are not supposed to have them.

Jose Zabala and another inmate, Frese, wanted me to give them my cigarettes. I refused. I had never met Zabala or Frese before. I had made no complaints prior to the attack about any problems I was having in the facility. I hadn't been there long enough.

The two attacked me. Frese held down my legs while Zabala attacked me. They beat me up and busted my eye up real bad.

Right after the attack I called security. I was taken up front and put in a holding cell. This happened right after I called and asked if I could be taken to the hospital. I was later put in B Max. Zabala was not in that pod. I was separated from him until May 27, 2004, when he was let into my pod. The only other time we were together after the attack was when he was let out in the yard when I was on yard call.

Zabala and Frese had previously attacked other inmates. The defendants knew these guys had aggressive personalities. I want to hold defendants responsible for not taking care of it properly. Defendants did take care of it medically.

After the incident, when I was with the nurse, Jeff Black talked to the nurse and asked who had attacked me. The nurse said I refused to give the names of the attackers.

I thought they were going to put me back in the pod. They didn't bring any of my stuff out. Black just threatened me. He said I would get no commissary that week. It wasn't friendly and

there wasn't any kind of talking. I had brought contraband into the facility.

On May 23, 2004, I went to Black's office to get the IFP (in forma pauperis) papers filled out for this lawsuit. Black, Melissa George, and Michael Wade were in the office. Black filled out the IFP papers.

Black asked who attacked me. Black told me if I continued with this lawsuit he would file additional charges on me for withholding evidence in the matter because I hadn't told him who attacked me at this point. Black said he would give me additional charges if I listened to Charles Prichard and continued with this complaint.

Wade already knew who attacked me. I didn't tell them but Wade said it was Jose Zabala. After Wade said this, Black asked me again and I said yes. I never filed criminal charges against Zabala. Neither Black nor Sheriff Phillips were physically present during the attack.

Any retaliation that occurred happened after May. Sheriff Phillips was not present during any conversations I had with Black or Wade.

After this, one of the people who had been in his office, went to Zabala and told him I filed grievances on him. On May 27, 2004, someone let Zabala into the pod and he came up to me and he threatened me. He referred to a grievance filed against him. He was a trustee at the time. Black didn't open the door and Sheriff Phillips wasn't there either but they are in charge of the facility. There had only been three people in the meeting in Black's office.

I filed another grievance against him dated May 28th and they fired him as a trustee. He was told the reason he was fired as trustee was because of the grievance I filed against him.

I wasn't filing grievances against him. I was filing grievances against the situation. I was filing this lawsuit.

AO72A
(Rev. 8/82)

On June 11, 2004, they let Zabala stay out on the yard when I was on the yard. We were in different pods at the time. I don't know why they let him stay on the yard. I didn't see Black or Sheriff Phillips. They put me at risk. I believe it was done in retaliation since Black had already told me they were going to file additional charges against me.

I didn't submit a grievance after Zabala was left out in the yard. I was worried about how it would be handled. There was a lack of security and a failure to protect. I don't know who in the office talked to Zabala but someone there is responsible. I feel it was probably the man in charge who was responsible–that would be Black. I don't believe Black actually attacked me but due to policies and procedures it was allowed to happen. No measures were taken to prevent such an attack.

I believe defendants were aware Zabala was dangerous. He had been moved from pod to pod because of attacks on other inmates. These attacks occurred before mine.

Prichard was also moved to a different pod. I believe I was separated from Prichard to keep me from getting his help on this lawsuit. I don't know if it hindered me. He was helping me. He helped me get the address of the court. He helped me fill out the papers and advised me on matters that came up.

I don't have any training. I was able to continue the lawsuit. I mailed the complaint from the detention center. I believed I mailed it on June 7, 2004. I don't know why it wasn't filed until June 23, 2004, unless the detention center didn't mail it right away. A couple of days later Prichard and I were separated. This is the lawsuit we are here on today.

I think their policies and procedures show they were deliberately indifferent. Not everyone was searched when they came into the facility. Also I think there should be a separate pod for

AO72A
(Rev. 8/82)

Arkansas Department of Correction (ADC) inmates and pretrial inmates. Zabala had attacked other inmates and security was aware of this.

### Testimony of H.L. Phillips

I am the Sheriff of Miller County. I have been in this position for seventeen years.

Black and I are part of the decision making team at the detention center. We have correctional officers, sergeants, and lieutenants who have input.

The guidelines were adopted prior to the opening of the facility. We have the responsibility of following the guidelines established by the State of Arkansas.

It is in the policy and guidelines that inmates coming into the facility are searched. If contraband is found, it is our responsibility to see the inmate is charged. We also see that the inmates are fully aware that they can't have these items.

Every inmate who enters the facility is characterized or placed in a category. The inmate is looked at to make the determination whether the inmate can be placed in the facility and who they can be placed with in the facility. Inmates are separated by category.

Pretrial prisoners are housed and kept separate from prisoners who have already been convicted. We do have a separation policy.

I was not told about the attack on Dilday until this lawsuit came up. If the staff feels an incident needs to be brought to my attention, it is.

We put forth great effort to determine who attacks another inmate and to determine if they should be prosecuted. We also try to make this determination due to the medical expenses involved to make sure the inmate receives the proper treatment. It is also up to the inmate who was assaulted to make us aware of who attacked him so that we can pursue it.

I had no knowledge of any attacks by Zabala or Frese against other inmates. I was not aware that Zabala or Frese were taking commissary items or stealing things from other inmates. I did know Zabala had been brought in for transportation of narcotics but I didn't know his status as an inmate.

I had no conversations with Dilday while he was incarcerated in Miller County. I was advised by my attorney that the lawsuit had been filed. Black had not told me about the lawsuit.

### *Testimony of Jeff Black*

I'm currently a school security director. Until August 26, 2005, I was employed by Miller County. I was the warden of the Miller County Correctional Facility. I occupied that position from September of 2002 until August of 2005.

I started about the time the new facility was getting ready to open. It opened in December of 2002. Prior to the facility opening, the way we classify inmates was approved by the Arkansas Committee on Jail Standards, the United States Marshal, and Immigration.

When an inmate comes into the facility we classify the inmate by his charges. We also have staff who have worked at the facility for ten to fifteen years and they know some of the guys. When these inmates come back into the facility, one of the staff might remember the inmate from before and recall that he was trouble. We take that into account. We try to separate people.

The attack on Dilday occurred either the first night or the next day after he arrived. If you look at Dilday's charges, I feel he was classified right and we were right in putting him in that pod.

If a fight does occur, we separate the inmates immediately. If we don't know who did it, we at least take the injured person out of there. If the fight occurs on Monday through Friday from 7:00 a.m. to 5:00 p.m., the inmate is taken to the infirmary. If the fight occurs at any other time,

-6-

AO72A
(Rev. 8/82)

the injured inmate is taken to the intake area. The intake area is always staffed with one, hopefully two, officers. The officers are within twenty feet of the inmate. The injured inmate is there for observation and protection.

Normally the injured inmates do not go back to the same pod. We have eleven pods. We try to move them around. We have a medical area and a max area. The ones with more serious charges are kept in the max area.

Dilday was moved to the intake area. He was taken to the hospital. When he returned from the hospital, he was taken to West D pod, the medical pod.

At some point I became aware that Dilday filed this lawsuit. He had been involved in an altercation and I talked to him two times in my office.

I was part of the decision making team at the facility. I had never been advised of any attacks by Zabala on other inmates before the attack on Dilday occurred. I don't recall hearing of any problems with Zabala before or after Dilday was attacked.

Under most conditions the staff would advise me of attacks but I had never been advised of trouble Zabala had been in during the time he had been at the facility. At our facility, we have correctional officers, sergeants, and lieutenants on duty. Any correctional officer can make a report concerning those issues.

We have video monitoring in the cells. The cameras are in the max area. The cameras are stationary so there are blind spots. The cameras did not catch anything of the incident involving Dilday.

There are usually eight to ten jailers on duty during the day time. Three are usually kept in the max area.

AO72A
(Rev. 8/82)

The mail is collected from the inmates each day. It is mailed out Monday through Friday. We do not have mail pick up or delivery on Saturday or Sunday. There is never mail held over. If mail is picked up from inmates later in the day, it is held until the next day.

We try to give one hour a day recreation call outside unless the weather does not permit it or there is some other safety issue going on in the jail. We have eleven pods. It takes eleven hours to do the recreation call. We do one pod at a time. If someone was left out on the yard, it would be a violation of the policy. I never told any employee to leave Zabala out on the yard while Dilday was out there.

I don't understand how Zabala could have entered Dilday's pod. I know Zabala was a trustee in our kitchen area. He was pulled as a trustee when he was caught passing food to inmates on the west end of the jail.

I never talked to Zabala about Dilday's allegations. Dilday never made any allegations against Zabala to me.

Willis Walker is a former inmate. Defendants' exhibit A is an incident report about a fight that occurred on November 2, 2003, between Isaac Napoleon and Willis Walker. Kevin Hampton broke up the fight. Hampton indicated Napoleon had minor cuts and Walker's mouth was bleeding. Neither inmate reported other injuries. There is no mention of Zabala having been involved.

Defendants' exhibit B is an incident report about an altercation between Jason Stovier and Kenneth Davenport. The fight occurred on October 8, 2003. Davenport was attacked and suffered injuries. He was taken to the emergency room. There is no mention of Zabala.

I initially talked to Dilday after his injuries when he returned from the hospital. I always

-8-

AO72A
(Rev. 8/82)

try to bring them in because I want to see what happened because of the extreme cost. I really want to follow up on it so I can file charges against the individuals that did it. It doesn't necessarily mean we will get the money if the court awards it. But I have to answer to the Quorum Court. I need to show where our expenditures are going. It was real important for me to file charges against the guy who did this due to the amount of money it took to take care of Dilday.

At that point in time, he would not talk to me about it at all. He stated he was scared to. I recall asking him if he had problems with Zabala and he said no. I thought maybe we had put someone in there with someone who was going to have problems down the road. Dilday stated he did not know the guys who did it. He stated he was not going to tell me who they were.

The next time I talked to him was when he received something from the district court concerning the lawsuit. Normally we bring each inmate up. There is a section on the bottom we have to fill in concerning their money and accounts. I brought him up because I wanted him to be there to explain what it was. If he has money, I wanted him to know we were pulling money from his account to pay the court. I just like the inmates to be there when we do that part.

When I brought him in, he sat down right in front of my desk. There were two other employees in my office. I helped him fill out his paperwork.

I did ask him again about who attacked him. He said: "I'm not saying." The last thing of that conversation was I asked him when he got out of our jail would he come back and file a report for me so I could follow up on it. He agreed to but he didn't mention a name.

Mike Wade never said who attacked Dilday. When that meeting was over, I still did not know who attacked him. I did not know who attacked Dilday until I received this lawsuit.

It is not uncommon for inmates to want to wait until they get out. He never came back and

-9-

filled out a report or tried to contact me.

I did not threaten Dilday with additional charges. I don't really know how I could have charged him with anything or what the charge could have been. He testified I was going to charge him with withholding evidence but I understand why some don't want to talk to me at that time. It is common for inmates to file lawsuits against me.

I made the decision to separate Dilday and Prichard. The decision was made because both Dilday and Prichard were in the medical pod. Prichard had been in there a couple of weeks. He claimed he had double vision and that he had been attacked. We sent him to the hospital for medical attention.

We had our local doctor read the final results of all the tests. Prichard was cleared of anything by MRI's.

Additionally, although the other inmates did not know this, Prichard was coming up for trial on four aggravated charges. We normally keep people with aggravated charges in what we call "Max A." After Prichard was cleared by the doctor, we moved him out of the medical pod and put him in Max A. Prichard also had a jury trial coming up a week later.

My decision to move Prichard had nothing to do with the action Dilday was taking. At one time Prichard had been on pretty heavy medication. That was the reason he was in the medical pod. But then the doctor cleared him and I moved him.

I can't tell you what medication Prichard was on. We have West D which is the medical pod. We can't keep everyone in there who is on medication. I moved Prichard after he was cleared. He was moved back to the pod he was classified for.

I had no conversation with Prichard where I threatened him. I believe he has two lawsuits

-10-

against me now. I am the officer who arrested Prichard so I try to let someone else deal with him.

I have no idea who told Zabala that Dilday was filing grievances on him. I have no idea who left Zabala out in the yard. At that point in time, I didn't know who had attacked Dilday. I didn't know who attacked Dilday until the lawsuit was filed.

### Testimony of Michael Wade

I am a transport officer for the Miller County Sheriff's Department. I was employed in that position in 2004.

I was in Black's office on May 23, 2004. Dilday did not say who attacked him. I didn't say who I believed it was. I have no idea who told Zabala that Dilday filed grievances against him.

### Testimony of Bradley Betus

I was an inmate in the MCDC in 2004. I was searched when I came into the facility.

I saw an altercation between Corky Zindouski, Zabala and another guy. I don't know if Corky filed a grievance but I do know he tried to get moved. I don't know if Corky talked to Black or Sheriff Phillips about Zabala. I don't know if Corky told any employees of Miller County about the altercation.

I wrote a kite on Ramos. He was threatening to take commissary items from inmates. I wrote the kite and had everyone sign it. When he was going to church, he saw it laying there on a file and got it.

I got in a fight with Ramos. He was removed from D pod.

### Testimony of Willis Walker

I'm currently in the ADC–Cummins Unit. I was in the medical pod with Dilday at the MCDC.

-11-

I recall Dilday and Prichard working on this lawsuit. I remember Zabala coming into the pod in a threatening manner and saying that Dilday had filed a grievance on him and the day on the yard when Zabala came out there. I don't know who brought Zabala to the pod or yard on those days.

I know Corky. I remember him talking about being attacked. He said it was Zabala who attacked him.

***Testimony of Charles Prichard***

I am an ADC inmate–Cummins Unit. I was in the medical pod with Dilday at the MCDC. I was in the medical pod because I was taking medication for Hepatitis and cirrhosis.

Dilday said that Zabala attacked him. I have training in paralegal work. I helped Dilday get the lawsuit started.

I was just pointing out a few things to Dilday that I thought was wrong in the jail and the way it took place. I told him what he needed to do to get his face fixed up. I told him he would probably have to file a civil rights case. His one eyeball was lower than his other.

I just told him he had the right to file a civil rights lawsuit. He filled out the lawsuit himself. I just told him he needed to put in all the dates he could remember. I mentioned things he should bring out including what happened and the names of anyone that was in there.

On May 23, 2004, Dilday went to get his IFP papers filled out. I was having problems getting mine filled out too. I went down with Dilday that day to get it done.

Later, Zabala was let into our pod. I also remember Zabala being on the yard and telling Dilday some crap. Zabala was a trustee.

I was searched when I came into the facility. I was attacked while I was there. There was

-12-

AO72A
(Rev. 8/82)

no response from security.

I believe Corky was attacked by the same inmate–Zabala.

Dilday and I were separated because the lawsuit was filed. I know we were. Ms. Janet said they did it. I was told Black was making some changes in the jail and I was one of the major changes. I was being moved to the aggravated pod. Ms. Janet said it was because I was helping inmates out with their legal stuff. I think Dilday was getting ready to file the case when I was moved. He was working on the complaint.

### *Testimony of Courtney Sims*

I'm currently incarcerated at the MCDC. When I was at the MCDC on a prior occasion, I was attacked. This was on September 10, 2003, or September 11th. I was brought in around 4:00 p.m. or 5:00 p.m. and put in D Max. I was not searched when I was brought in.

I was attacked within an hour or so. I got jumped and my shoes got taken. I had never seen the person who attacked me before in my life. I didn't know it was going to happen so I hadn't complained.

They have buttons inside the cell to call for help. I pressed the button but no one came. Officer Chaney came by at lock down. The fight had been over for hours. He came and moved me out and took me out front. This was about two or three hours after the attack.

I was sent to the hospital. When I came back from the hospital, Black pulled me into his office and talked to me. He put me up front for about twenty days and then locked me down in A Max. I never talked to Sheriff Phillips about the incident.

I don't recall if I filed a grievance about the attack. There were three inmates involved–Isaac Napoleon, Joshua Jones, and I can't remember the name of the third one. I know

AO72A
(Rev. 8/82)

one of the inmates involved was an ADC inmate. It was a "he said, she said" thing. When I was brought in the detective told the booking officer to keep us separated. I cooperated with the officials on my case. There was a rumor that someone in security had told someone in my pod that I cooperated.

## II. DISCUSSION

As noted above, Dilday asserts two separate claims. First, he contends the defendants failed to protect him from attack by fellow inmates. Second, he contends he was retaliated against for filing grievances and/or filing this lawsuit. We will address each claim in turn.

### *Failure to Protect*

Dilday was a pretrial detainee. Due process 'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988). Similarly, the Eighth Amendment imposes a duty on the part of prison officials to protect convicted prisoners from violence at the hands of other prisoners. *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998). In addressing failure to protect claims brought by pretrial detainees, the Eighth Circuit has noted that the pretrial detainees are entitled to at least as much protection as a convicted inmate and has applied Eighth Amendment analysis to claims brought both by pretrial detainees and convicted prisoners. *Perkins*, 161 F.3d at 1129-1130. *See also Crow v. Montgomery*, 403 F.3d 598, 601 (8th Cir. 2005)(applying identical deliberate indifference standard to pretrial detainees); *Thomas v. Booker*, 784 F.2d 299 (8th Cir. 1986)(analyzing a pretrial detainee's failure to protect claim under the same Eighth Amendment analysis used for similar claims brought by prisoners.).

In *Riley v. Olk-Long*, 282 F.3d 592 (8th Cir. 2002), the court stated:

An Eighth Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the defendant prison official recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). "For the purposes of failure to protect claims, it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to [him] or because all prisoners in [his] situation face such a risk." *Hott v. Hennepin County, Minn.,* 260 F.3d 901, 906 (8th Cir. 2001) (internal quotations omitted). The question is whether a prison official has a "sufficiently culpable state of mind," meaning that [he] is deliberately indifferent to an inmate's safety. *Farmer,* 511 U.S. at 834 (internal quotation omitted). The prison official's state of mind is measured by a subjective, rather than an objective, standard. *Id.* at 838-39; *see also Jackson,* 140 F.3d at 1152 ("[D]eliberate indifference must be viewed from [defendants'] perspective at the time in question, not with hindsight's perfect vision."). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference." *Farmer,* 511 U.S. at 837.

*Riley,* 282 F.3d at 595. *See also Krein v. Norris*, 309 F.3d 487 (8th Cir. 2002)

Thus, to prevail, Dilday must show: (1) that his incarceration with Zabaia and Frese posed a substantial risk of serious harm, and (2) each of the defendants knew of and disregarded an excessive risk to Dilday's safety. *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003). To establish the second component, Dilday must show that each defendant acted, or failed to act, with deliberate indifference to Dilday's safety. *Id.* Negligence is not sufficient. *Id.* Even if the conduct was unreasonable, this is not enough because "reasonableness is a negligence standard." *Id.* at 742 (internal quotation marks and citation omitted). Further, the Eighth Circuit has noted that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 740-741 (internal quotation marks and citation omitted).

In *Perkins v. Grimes*, 161 F.3d 1127 (8th Cir. 1998), the district court "agreed that

-15-

defendants were on notice that Wilson was a disruptive inmate," but found defendants "had no notice that Wilson posed a threat of serious injury to Perkins because Perkins did not effectively alert them that he faced such a threat." *Id.* at 1130. Further, the district court found that "the defendants periodic cell checks yielded no information that would have put them on such notice." *Id.* The Eighth Circuit found no clear error. *Id.* It noted that "[a]lthough the testimony indicated that Wilson was an easily provoked detainee, the evidence also shows that Perkins and Wilson had previously been housed together without incident and that Perkins' jailers neither knew, or had reason to know, that Wilson was a violent sexual aggressor, either on this or on a previous occasion." *Id.*

Applying these principles, we conclude the testimony at the hearing fails to establish that the defendants had any knowledge that Zabala or Frese were a danger to Dilday in particular, or to inmates in general, at the time of the attack on Dilday. First, we note the attack on Dilday occurred the day after he was incarcerated. He had never met Zabala or Frese or had any problems with them prior to the attack. Second, although Brad Betus, Willis Walker, and Charles Prichard testified Zabala had been in an altercation with Corky Zindouski, the testimony did not establish when the altercation occurred or that the altercation was reported to Black, Sheriff Phillips, or any other employee of the detention center. The testimony simply failed to establish that the defendants had any knowledge that Zabala or Frese had engaged in intimidating or threatening conduct towards other inmates prior to the attack on Dilday, or had attacked other inmates, or had made a practice of stealing items from other inmates.

With respect to the later activities of Zabala, when he came into the pod and remained on the recreation yard, both Black and Sheriff Phillips testified they had no knowledge regarding how Zabala got into the pod or left on the yard. Black testified that only one pod was supposed to be

-16-

on the yard at a time. If Zabala was left on the yard or let out onto the yard when a different pod was on recreation call, Black testified this would be a violation of the detention center's policy. No testimony was offered from any other witness indicating the defendants had any connection with these incidents or any knowledge regarding the incidents. No testimony was offered suggesting similar incidents had occurred on prior occasions or that a lack or training, a disregard of the safety needs of inmates, or a lack of security contributed to the incidents. We conclude Dilday has failed to show he was incarcerated under conditions posing a substantial risk of serious harm and that the defendants subjectively knew of and disregarded the safety risk. *Nei v. Dooley*, 372 F.3d 1003, 1006 (8th Cir. 2004).

### *Retaliation*

In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)(citation omitted); *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)(same). "Indeed, the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable." *Id.* *See also Dixon v. Brown*, 38 F.3d 379, 380 (8th Cir. 1994)("[W]hen retaliatory conduct is involved, there is no independent injury requirement.").

To prevail on his retaliation claim, Dilday must demonstrate: (1) that he engaged in protected activity; (2) that the defendants in response took adverse action; and (3) that his protected activity was the cause of the retaliation. *See Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994)(threat of retaliation is sufficient injury if made in retaliation for inmate's use of prison grievance procedure).

Dilday testified the retaliatory conduct occurred after May of 2004. He identified the

-17-

following retaliatory acts: (1) Black's threat on May 23, 2004, to have additional charges filed against Dilday for withholding evidence if he continued with his lawsuit; (2) someone who had been in Black's office on May 23rd telling Zabala that Dilday had filed grievances against him; (3) Zabala being allowed into the medical pod on May 27, 2004; (4) Zabala being told the reason he was removed from his position as trustee was because Dilday submitted another grievance about him; (5) Zabala being allowed to stay out on the yard on June 11, 2004, when Dilday was on the yard; and (6) Prichard being moved to a different pod a couple of days after Dilday mailed his complaint to be filed.

As was noted above in connection with the failure to protect claim, there was no evidence to establish Black had anything to do with most of the acts identified by Dilday as retaliatory. Specifically, no testimony or other evidence was introduced suggesting Black was directly involved in, or even aware of, the following: someone who had been in Black's office on May 23rd telling Zabala that Dilday had filed grievances against him; Zabala being allowed into the medical pod on May 27, 2004; Zabala being told the reason he was removed from his position as trustee was because Dilday submitted another grievance about him; and Zabala being allowed to stay out on the yard on June 11, 2004, when Dilday was on the yard.

This leaves only Black's alleged threat of additional charges and the transfer of Prichard. Dilday testified that on May 23, 2004, Black threatened to have additional charges filed against Dilday for withholding evidence if he continued with his lawsuit. Black denies having made this threat. The only other individual present in the room that day who was called to testify was Michael Wade. Wade was not asked about this alleged threat.

We find Dilday's testimony about this threat not credible. At the same time the threat was allegedly made, Black assisted Dilday in completing the IFP form that needed to be sent to the

-18-

AO72A
(Rev. 8/82)

court with his complaint. There is no indication Black delayed in completing the form or blocked Dilday in anyway from corresponding with the court and filing the lawsuit with this court. In fact, Dilday testified he completed the complaint and sent it to the court while he was incarcerated at the MCDC.

The final act that Dilday contends was retaliatory was Black's decision to transfer Prichard from the medical pod. Dilday maintains Prichard was transferred to prevent Dilday from obtaining Prichard's help with the lawsuit. Dilday also testified that the complaint was mailed to the court for filing on June 7th several days prior to Prichard's transfer out of the medical pod.

Because nearly every otherwise routine administrative decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Further, the courts have recognized that prison officials must have broad administrative authority. *Graham*, 89 F.3d at 79. For this reason, it has been said that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)(not every response to a prisoner's exercise of a constitutional right is actionable). *See also Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996)(per curiam)(Speculative and conclusory allegations cannot support a retaliation claim).

We find Dilday has failed to establish that a desire to retaliate against him was a reason for Prichard's transfer. With respect the alleged threat made by Black, even if such a threat was made, there is no evidence to suggest his actions were in retaliation for Dilday's exercise of his right First Amendment right to file grievances or seek access to the courts rather than out of a

-19-

desire to obtain the identity of Dilday's attacker. We credit Black's testimony that he did not know who attacked Dilday until the lawsuit was filed. We find credible the testimony that the detention center follows-up on such incidents in order to file criminal charges against the attacker and to recover medical expenses they incur in providing treatment to the injured inmate.

With respect to Sheriff Phillips, there was absolutely no testimony or evidence presented even suggesting he was personally involved in any of the alleged retaliatory acts. Further, there was no evidence introduced establishing that he was aware of the alleged retaliatory acts or of Dilday's complaints of retaliation by Black or others at the detention center. Sheriff Phillips' uncontradicted testimony was that he was not aware of the attack on Dilday until the day he was served with the lawsuit and did not know about the lawsuit until advised it had been filed by his attorney. There is simply no basis on which Sheriff Phillips can be held liable.

### III. CONCLUSION

I therefore recommend that judgment be entered in the defendants' favor and that this case be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of October 2005.

/s/ Bobby E. Shepherd
UNITED STATES MAGISTRATE JUDGE

-20-